'UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
MAGISTRATE JUDGE

------------------------------------------x
JEFFREY C. RODRIGUES, Individually and ) Civ. No.
On Behalf of All Others Similarly        )
Situated,                                )  04 cv 10364 DPW
                                         )
                    Plaintiff,           ) CLASS ACTION
            v.                           ) COMPLAINT FOR VIOLATION
                                         ) OF THE FEDERAL
SONUS NETWORKS INC., HASSAN M. AHMED,    ) SECURITIES LAWS
STEPHEN J. NILL,                         )
                                         )  RECEIPT #_____
                    Defendants.          ) DEMAND FOR JURY TRIAL
------------------------------------------x   AMOUNT$_____
                                              SUMMONS ISSUED_____
                                              LOCAL RULE 4.1_____
                                              WAIVER FORM _____
                                              MCF ISSUED_____
                **INTRODUCTION**              BY DPTY. CLK._____
                                              DATE_____

        Plaintiff alleges the following on information and
belief, except as to the allegations in Paragraph 9, based upon the
investigation of plaintiff's counsel, which includes a review of
United States Securities and Exchange Commission ("SEC") filings by
Sonus Networks Inc. ("Sonus" or the "Company"), as well as
regulatory filings and reports, securities analysts' reports and
advisories about the Company, press releases and other public
statements issued by the Company, and media reports about the
Company, and plaintiff believes that substantial additional
evidentiary support will exist for the allegations set forth herein
after a reasonable opportunity for discovery.

        1.    According to Sonus public filings, Sonus is a
provider of voice infrastructure solutions for the new public
network. The Company's products are a new generation of

carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks. By enabling voice traffic to be carried over these packet-based networks, the Company's products will accelerate the convergence of voice and data into the new public network. The Company's suite of voice infrastructure solutions includes the GSX9000 Open Services Switch, the Insignus Softswitch and the Sonus Insight Management System.

2. During the period commencing April 9, 2003 and ending February 11, 2004 (the "Class Period") defendants issued numerous statements to the market concerning the Company's performance and financial results that failed to disclose and/or misrepresented the following adverse facts among others: (a) that defendants improperly and untimely recognized revenue on certain customer transactions; (b) that defendants violated Generally Accepted Accounting Principles ("GAAP") and the Company's own internal policies concerning timing of revenue recognition; and (c) as a result of these misstatements and/or omissions, net income and earnings per share information reported during the Class Period were materially overstated and thus false and misleading.

3. On February 11, 2004, Sonus surprised the market, announcing that millions of dollars in transactions included in its 2003 results may have been improperly booked and that it may have to restate those results, because its 2003 financial statements were not a fair presentation of Sonus' results and not presented in

accordance with GAAP and SEC rules.

4.    The market's reaction to this disturbing news was swift and severe, causing shares of Sonus to plummet, from $6.69 to $5.02 per share, or almost 25% in extraordinarily heavy trading.

### JURISDICTION AND VENUE

5.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

6.    This Court has jurisdiction of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. §§ 1331 and 1337.

7.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391 (b) and (c). Sonus maintains its headquarters in this District and many of the acts and wrongs complained of herein occurred in this District.

8.    In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange (the "NYSE"), a national securities exchange.

### THE PARTIES

9.    Plaintiff,    purchased    Sonus    publicly    traded

3

securities as detailed in the attached Certification and was damaged thereby.

10.   Defendant Sonus is a Delaware corporation with its principal place of business located at 5 Carlisle Road, Westford, Massachusetts 01886.

11.   Defendant Hassan Ahmed, Ph.D. ("Ahmed"), was President and Chief Executive Officer during the Class Period. Ahmed assisted in the preparation of the false financial statements and repeated the contents therein to the market.

12.   Defendant Stephen J. Nill ("Nill") was the Chief Financial Officer of Sonus during the Class Period. Nill assisted in the preparation of the false financial statements and repeated the contents therein to the market and signed the Forms 10-Q verifying the accuracy of the financial statements that the Company now admits were false.

13.   Defendants Ahmed and Nill are the "Individual Defendants." They are liable for the false statements pleaded below, as those statements were "group-published" information.

14.   Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of

4

actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

15.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of Sonus, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

16.    As officers and controlling persons of a

5

publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their executive and managerial positions with Sonus, each Individual Defendant had access to the adverse undisclosed information about Sonus' business prospects and financial condition and performance as particularized herein and knew (or recklessly

6

disregarded) that these adverse facts rendered the positive representations made by or about Sonus and its business issued or adopted by the Company materially false and misleading.

18. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

19. Each defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Sonus common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding Sonus' business, sales practices, operations and the intrinsic value of Sonus common stock; (b) allowed defendants to successfully complete two public offerings of Sonus stock generating proceeds of approximately $182 million for the Company;

and (c) caused plaintiff and other members of the Class to purchase Sonus common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

20. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the class, consisting of all persons who purchased or otherwise acquired Sonus common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, members of the immediate family of each Individual Defendant, any subsidiary or affiliate of Sonus and the directors and officers of Sonus or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

21. The Class members are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of Class members located throughout the United States. Throughout the Class Period, Sonus common stock was actively traded on the Nasdaq (an open and efficient market) under the symbol "SONS". Record owners and other Class members may be identified from records maintained by Sonus and/or its transfer agents and may be notified of the pendency of this action by mail,

using a form of notice similar to that customarily used in securities class actions.

22.  Plaintiff's claims are typical of the claims of the other Class members as all Class members were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

23.  Plaintiff will fairly and adequately protect the Class members interest and has retained counsel competent and experienced in class and securities litigation.

24.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.  whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

b.  whether defendants participated in and pursued the common course of conduct complained of herein;

c.  whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about Sonus' business, finances, financial condition and prospects;

d.  whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about Sonus business, finances,

9

value, performance and prospects;

e.    whether the market price of Sonus common stock
during the Class Period was artificially inflated due to the
material misrepresentations and failures to correct the material
misrepresentations complained of herein; and

f.    the extent to which the members of the Class
have sustained damages and the proper measure of damages.

25.    A class action is superior to all other available
methods for the fair and efficient adjudication of this controversy
since joinder of all members is impracticable. Furthermore, as the
damages suffered by individual Class members may be relatively
small, the expense and burden of individual litigation make it
impossible for members of the Class to individually redress the
wrongs done to them. There will be no difficulty in the management
of this suit as a class action.

## SUBSTANTIVE ALLEGATIONS

26.    The Class Period begins on April 9, 2003 when the
Company issued a press release entitled "Sonus Networks Reports
2003 First Quarter Results." The press release stated in part:

> Sonus Networks, Inc., a leading provider of voice
> infrastructure solutions for the new public
> network, today reported its financial results for
> the first quarter ended March 31, 2003 ...
>
> *   *   *
>
> Revenues for the first quarter of fiscal 2003
> were $16.0 million compared with $12.7 million in
> the fourth quarter of fiscal 2002. Net loss for the

first quarter of fiscal 2003 was $4.4 million or
$0.02 per share compared with a net loss for the
fourth quarter of fiscal 2002 of $12.8 million or
$0.07 per share. Revenues for the first quarter of
fiscal 2002 were $21.2 million and the net loss for
the first quarter of 2002 was $16.2 million or
$0.09 per share.

"Our financial results for the first quarter
reflected good progress toward our business
objectives," said Hassan Ahmed, president and CEO,
Sonus Networks. "We grew our revenues 27 percent
over last quarter, and by continuing to manage our
business with precision, we further narrowed our
net loss. In Q1, we also continued to add new
customers around the globe and made important
additions to our product family."

27.    On April 24, 2003, Sonus completed a public offering
of 20,000,000 shares of its common stock at $3.05 per share,
resulting in net proceeds of $56,730,000 after deducting costs
of $4,270,000.

28.    On July 10, 2003, the Company issued a press release
entitled "Sonus Networks Reports 2003 Second Quarter Financial
Results." The press release stated in part:

Sonus Networks, Inc., a leading provider of voice
infrastructure    solutions    for    the    new    public
network, today reported its financial results for
the second quarter ended June 30, 2003.

*  *  *

Revenues for the second quarter of fiscal 2003
were $21.4 million compared with $16.0 million for
the first quarter of fiscal 2003 and $21.3 million
for the second quarter of fiscal 2002. Net loss for
the second quarter of fiscal 2003 was $3.2 million
or $0.01 per share compared with a net loss for the
first quarter of fiscal 2003 of $4.4 million or
$0.02 per share and a net loss of $17.8 million or

11

$0.09 per share for the second quarter of fiscal 2002.

*   *   *

Revenues for the first six months of fiscal 2003 were $37.4 million compared with $42.5 million in the same period last year. Net loss for the first six months of fiscal 2003 was $7.6 million or $0.04 per share compared with a net loss for the first six months of fiscal 2002 of $34.0 million or $0.18 per share.

"We are pleased with the progress that we made in the second quarter, particularly with our 33% sequential revenue growth," said Hassan Ahmed, president and CEO, Sonus Networks. "We executed across all areas of the business – broadening and strengthening our customer base, expanding our leading product offering, bolstering our balance sheet and advancing our drive to profitability."

29.  On September 23, 2003, Sonus completed a public offering of 17,000,000 shares of its common stock at $7.75 per share, resulting in net proceeds of $126,025,000 after deducting offering costs of $5,725,000.

30.  On October 8, 2003, the Company issued a press release entitled "Sonus Networks Reports 2003 Third Quarter Financial Results." The press release stated in part:

Sonus Networks, Inc., a leading provider of carrier packet voice infrastructure solutions, today reported its financial results for the third quarter ended September 30, 2003 in accordance with U.S. generally accepted accounting principles (GAAP).

Revenues for the third quarter of fiscal 2003 were $28.6 million compared with $21.4 million for the second quarter of fiscal 2003 and $7.4 million for the third quarter of fiscal 2002. Net income for the third quarter of fiscal 2003 was $1.2

12

million or $0.01 per diluted share compared with a net loss for the second quarter of fiscal 2003 of $3.2 million or $0.01 per diluted share and a net loss of $21.6 million or $0.11 per diluted share for the third quarter of fiscal 2002.

Revenues for the first nine months of fiscal 2003 were $66.0 million compared with $49.9 million in the same period last year. Net loss for the fist nine months of fiscal 2003 was $6.4 million or $0.03 per diluted share compared with a net loss for the fist nine months of fiscal 2002 of $55.7 million or $0.30 per diluted share.

"This was a strong quarter for Sonus Networks, our fourth consecutive quarter of revenue growth," said Hassan Ahmed, president and CEO, Sonus Networks. "Our revenues grew 34% sequentially to $28.6 million, reflecting increased market demand for packet telephony and the expanding number of customers who have adopted Sonus' solutions. We achieved an important milestone in reporting our first quarterly profit on a GAAP basis. Additionally, we bolstered our balance sheet to capitalize on the opportunity ahead, adding $126 million to our cash and marketable securities through a common stock offering in September."

31. On January 20, 2004, the Company issued a press release announcing the Company postponed the release of its fourth quarter and full year 2003 financial results pending the completion of its 2003 audit.

32. On February 11, 2004, after the markets closed, the Company issued a press release that provided additional information regarding the delay in reporting its fourth quarter and full fiscal year financial results for the year ended December 31, 2003. The press release stated in part:

Sonus Networks today provided additional information regarding the delay in reporting its

13

fourth quarter and full fiscal year financial
results for the year ended December 31, 2003. In
connection with the year-end audit, Sonus Networks
and its independent auditors have identified
certain issues, practices and actions of certain
employees relating to both the timing of revenue
recognized from certain customer transactions and
to certain other financial statement accounts,
which may affect the Company's 2003 financial
statements and possibly financial statements for
prior periods.

33.  In reaction to the news, on February 12, 2004,
shares of Sonus fell sharply, off 24.9% from the previous day's
close.

## SONUS' FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD

34.  The 2003 results as reflected in ¶¶ 26-32 above were
included in Forms 10-Q filed with the SEC. The results were also
included in press releases disseminated to the public.

35.  Sonus announced that transactions included in its
2003 results were improperly accounted for and that the reported
earnings for 2003 will have to be restated. Such restatements will
remove millions in improperly reported revenues, such that its 2003
financial statements were not a fair presentation of Sonus' results
and were presented in violation of GAAP and SEC rules.

36.  The transactions were also improperly accounted for
under Sonus' revenue recognition policy.  Sonus' revenue
recognition policy is contained in its Form 10Q for the period
ending September 30, 2003. It states:

"Sonus recognizes revenues from product sales to
end users, resellers and distributors upon

14

shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenues when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenues are recognized as the services are provided. Revenues from maintenance and support arrangements are recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition."

37. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01 (a).

38. In Sonus' 2002 Form 10-K it represented that it recognized revenue in accordance with GAAP.

39. Pursuant to GAAP, which describes the accounting for

15

revenues, revenue should not be recognized unless there is persuasive evidence of an agreement, collection is probable and delivery has occurred.

40. During the Class Period, Sonus improperly recognized revenue even though these conditions did not exist.

41. The fact that Sonus may have to restate its financial statements for 2003 is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Sonus was to correct for material errors in its previously issued financial statements. See APB No. 20, 7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, and it makes it difficult to compare financial statements. See APB No. 20, 14. Thus, GAAP provides that financial statements should only be restated in limited circumstances, i.e., when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements. Sonus' possible restatement will not be due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the possibility of a restatement may be seen as an admission by Sonus

16

that its previously issued financial results and its public statements regarding those results were false.

42. Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, including the following fundamental accounting principles:

(a) Interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB 26 No. 28, 10);

(b) Financial reporting should provide useful information to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, 34);

(c) Financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, 40);

(d) Financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective

17

investors and to the public in general (FASB Statement of Concepts No. 1, 50);

(e) Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least partly, on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, 42);

(f) Financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, 58-59);

(g) Completeness, i.e., nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, 79); and

(h) Conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, 95, 97).

18